**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA TRUCKING
ASSOCIATION,
                    *Plaintiff-Appellant*,

                v.

JULIE A. SU,
                    *Defendant-Appellee.*

No. 17-55133

D.C. No.
CV 16-1866 CAB

OPINION

Appeal from the United States District Court
for the Southern District of California
Cathy Ann Bencivengo, District Judge, Presiding

Argued and Submitted March 7, 2018
Pasadena, California

Filed September 10, 2018

Before: A. Wallace Tashima, Richard A. Paez,[*]
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Tashima

---

[*] Following the death of Judge Reinhardt, who originally was a member of this panel, Judge Paez was randomly drawn to replace him. He has read the briefs, reviewed the record, and listened to a recording of oral argument.

## SUMMARY[**]

### Labor Law

The panel affirmed the district court's dismissal of an action seeking declaratory and injunctive relief regarding the Labor Commissioner of the State of California Department of Industrial Relations' use of a common law test, often referred to as the *Borello* standard, to determine whether a motor carrier has properly classified its drivers as independent contractors.

Classifications pursuant to the *Borello* standard impact what benefits workers are entitled to under the State's labor laws and the corresponding burdens placed on the entities that hire them. California Trucking Association, an association of licensed motor carriers, alleged that its "owner-operator" drivers were independent contractors, rather than employees. CTA alleged that the Commissioner's application of the *Borello* standard disrupted the contractual arrangements between owner-operators and motor carriers, which introduced inefficiencies into the transportation services market and was inconsistent with Congress's deregulatory goals under the Federal Aviation Administration Authorization Act.

The panel held that the *Borello* standard, a generally applicable test used in a traditional area of state regulation, is not "related to" prices, routes, or services, and therefore is not preempted by the FAAAA.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Adam Carl Smedstad (argued), Scopelitis Garvin Light Hanson & Feary, PC, Chicago, Illinois, for Plaintiff-Appellant.

Miles E. Locker (argued), Department of Industrial Relations, California Division of Labor Standards Enforcement, San Francisco, California, for Defendant-Appellee.

**OPINION**

TASHIMA, Circuit Judge:

The issue in this case is whether the Federal Aviation Administration Authorization Act of 1994 ("FAAAA") preempts the California Labor Commissioner's use of a common law test, often referred to as the *Borello* standard,[1] to determine whether a motor carrier has properly classified its drivers as independent contractors. Classifications pursuant to the *Borello* standard impact what benefits workers are entitled to under the State's labor laws and the corresponding burdens placed on the entities that hire them. We hold that the *Borello* standard, a generally applicable test used in a traditional area of state regulation, is not "related to" prices, routes, or services, and therefore is not preempted. By the FAAAA Accordingly, we affirm the district court.

---

[1] *See generally S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399, 403–07 (Cal. 1989).

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiff-Appellant California Trucking Association ("CTA") is an association devoted to advancing the interests of its motor carrier members.[3] CTA members are licensed motor carrier companies that manage, coordinate, and schedule the movement of property throughout California in interstate commerce. Based on factors such as efficiency and market demand, CTA members use either "company drivers" or "owner-operators" to haul freight. As expected, "company drivers" haul freight using trucks that are owned by the motor carrier; "owner-operators" use their own trucks. When CTA members use owner-operators, the parties enter into contracts providing, generally, that the owner-operators: (1) must provide the truck and a qualified driver to haul the freight; (2) must be responsible for operating expenses like truck maintenance, repair, and refueling; (3) will, in turn, have control over whether and how to perform a haul; and (4) will then be paid at an agreed-upon rate. CTA alleges that owner-operators are independent contractors.

---

[2] We accept the factual allegations in CTA's Complaint as true and construe them in the light most favorable to CTA. *Soo Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017). We reject CTA's contention that the district court failed to do the same. The district court was not required to accept the truth of any legal conclusions, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and the district court's summary of CTA's legal arguments does not, in any way, demonstrate that it applied an incorrect standard of review.

[3] "A 'motor carrier' is an individual, a partnership, or a corporation engaged in the transportation of goods; those engaged in interstate commerce are subject to, *inter alia*: Department of Transportation regulations; the Motor Carrier Acts; and the Motor Carrier Safety Acts." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1049 n.4 (9th Cir. 2009) ("*American Trucking*") (citations omitted).

CTA filed suit against Defendant-Appellee Julie Su in her official capacity as Labor Commissioner of the State of California Department of Industrial Relations (the "Commissioner"). The Commissioner is responsible for enforcing the California Labor Code, which affords certain benefits and protections to workers who qualify as employees. As with any other industry, the Commissioner applies the *Borello* standard to assess owner-operators' claims that they have been misclassified as independent contractors and so denied certain benefits under the Labor Code. CTA alleges the Commissioner's application of the *Borello* standard disrupts the contractual arrangements between owner-operators and motor carriers, which introduces inefficiencies into the transportation services market and is inconsistent with Congress' deregulatory goals under the FAAAA. CTA therefore seeks a declaration that the FAAAA preempts the Commissioner's application of the *Borello* standard to disrupt these contracts, and corresponding injunctive relief barring the Commissioner from applying the *Borello* standard to motor carriers.

The Commissioner moved to dismiss CTA's Complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion, concluding that the *Borello* standard used by the Commissioner was not preempted under the FAAAA. The district court denied CTA's motion for reconsideration, and CTA timely appealed the dismissal of its Complaint.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court's decision regarding preemption, *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 640 (9th Cir. 2014),

as well as a dismissal under Rule 12(b)(6), *Soo Park*, 851 F.3d at 918.

## DISCUSSION

### A. Background Principles

This case involves a purported clash between a common law test used to enforce California's labor laws and a federal statute aimed at preventing States from undermining federal deregulation of interstate transport. We provide a brief overview of each, before explaining why the latter does not preempt the former.

### 1. The *Borello* Standard

In *Borello*, the California Supreme Court discussed at length the common law test for determining whether a worker is an employee or an independent contractor. *See* 769 P.2d at 403–07; *see also Dynamex Operations W. v. Superior Court*, 416 P.3d 1, 15 (Cal. 2018) (describing *Borello* as "the seminal California decision on this subject"). "Under the common law, "'[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.""" *Ayala v. Antelope Valley Newspapers, Inc.*, 327 P.3d 165, 171 (Cal. 2014) (quoting *Borello*, 769 P.2d at 404). "Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause . . . ." *Id.* Aside from the right to control, courts also consider a list of "secondary indicia" that inform the task of classifying workers. *See id.* Drawn from the Restatement Second of Agency, these include

(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Borello*, 769 P.2d at 404. The *Borello* standard is neither mechanical nor inflexible; different cases can and do demand focus on different factors. *See id.* While an affirmative agreement to classify a particular worker one way or another may be considered, it "is not dispositive, and subterfuges are not countenanced." *Id.* at 403. Instead, the *Borello* standard is applied with an eye towards the purpose of the remedial statute being enforced. *Dynamex*, 416 P.3d at 19–20. "In other words, *Borello* calls for the application of a *statutory purpose* standard that considers the control of details and other potentially relevant factors identified in prior California and out-of-state cases in order to determine which classification . . . best effectuates the underlying legislative intent and objective of the statutory scheme at issue." *Id.*

We have applied the *Borello* standard when assessing misclassification claims in the motor carriage industry. *See, e.g.*, *Narayan v. EGL, Inc.*, 616 F.3d 895, 900–04 (9th Cir. 2010). Relevant here, the Commissioner applies the *Borello* standard when adjudicating and enforcing claims within her jurisdiction. If she were to determine that, under *Borello*, certain owner-operators are employees of a motor carrier, this could result in obligations under the California Labor Code that are inconsistent with the parties' contractual arrangements (*e.g.*, who is responsible for truck maintenance expenses). CTA contends the FAAAA thus compels the Commissioner and courts to accept the parties' agreements at face value. The Commissioner, in turn, seeks the power (as with any other employer) to look behind the agreements and apply the *Borello* standard to ensure that owner-operators are, in fact, independent contractors.[4]

---

[4] Shortly after argument in this case, the California Supreme Court decided *Dynamex*, which addressed the classification of workers for purposes of California wage orders. 416 P.3d at 4–7, 25–42. *Dynamex* held that the "suffer or permit to work" definition of "employ" in a particular wage order must be determined based on the "ABC" test – not the *Borello* standard. *See id.* at 7, 40. Under the "ABC" test, a worker must meet three, separate criteria to be considered an independent contractor. *See id.* at 7, 36–40. One criteria ("B") is "that the worker performs work that is outside the usual course of the hiring entity's business." *Id.* at 7, 37–38. Under *Borello*, this is one factor among many – and not even the most important one. *See* 769 P.2d at 404.

We do not believe *Dynamex* has any impact here (nor have the parties argued that it does). CTA seeks relief from California's common law definition of employee, as reflected in *Borello*. CTA has not alleged that the Commissioner employs the "ABC" test, nor has it sought relief on this basis. Moreover, *Dynamex* did not purport to replace the *Borello* standard in every instance where a worker must be classified as either an independent contractor or an employee for purposes of enforcing California's labor protections. *See* 416 P.3d at 7 n.5, 13, 29.

## 2.  The FAAAA

The FAAAA expressly preempts certain state regulation of intrastate motor carriage.  49 U.S.C. § 14501(c)(1).  "In considering the preemptive scope of a statute, congressional intent is the ultimate touchstone."  *Dilts*, 769 F.3d at 642 (citation and internal quotation marks omitted).  With express preemption, "we focus first on the statutory language, which necessarily contains the best evidence of Congress' pre-emptive intent."  *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (citation and internal quotation marks omitted).  The FAAAA provides:

> (c) Motor carriers of property.–(1) General rule.  Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.

49 U.S.C. § 14501(c)(1).  This language resembles that found in the air carrier preemption provision of the Airline Deregulation Act ("ADA"), except for the FAAAA's inclusion of the phrase, "with respect to the transportation of property."  *Compare id.*, *with* 49 U.S.C. § 41713(b)(1). ADA preemption cases can therefore be consulted to analyze

FAAAA preemption. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370–71 (2008).[5]

In the context of the ADA and FAAAA, "[t]he phrase 'related to' embraces state laws 'having a connection with or reference to' carrier 'rates, routes, or services,' whether directly or indirectly." *Dan's City*, 569 U.S. at 260 (quoting *Rowe*, 552 U.S. at 370). While "related to" preemption is broad, this "does not mean the sky is the limit," or else "pre-emption would never run its course." *Id.* (citation and internal quotation marks omitted). Thus, the FAAAA does not preempt state laws that affect a carrier's prices, routes, or services in only a "tenuous, remote, or peripheral . . . manner" with no significant impact on Congress's deregulatory objectives. *Rowe*, 552 U.S. at 371 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 390 (1992)) (alteration in original). Our task, then, is to discern on which side of the line the *Borello* standard falls: a forbidden law that significantly impacts a carrier's prices, routes, or services; or, a permissible one that has only a tenuous, remote, or peripheral connection. *Dilts*, 769 F.3d at 643.

Because this task has nuance, we may "turn . . . to the legislative history and broader statutory framework of the FAAAA" to better glean Congress' intent. *Id.* We have previously recounted the FAAAA's history and purpose in detail, so, for our purposes here, it is sufficient to note that Congress passed the FAAAA to achieve two broad goals. *See Californians For Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1187 (9th Cir. 1998). First, it

---

[5] The Commissioner does not dispute that the transportation of property is involved here, and so we focus on the "related to a price, route, or service" element of FAAAA preemption.

aimed "to even the playing field between air carriers and motor carriers." *Id.* (citation and internal quotation marks omitted). Prior decisions applied ADA preemption to regulations of air carriers, but not motor carriers, which gave air carriers a competitive advantage. *Id.* The FAAAA was an attempt at "parity." *Dilts*, 769 F.3d at 644. Second, Congress believed deregulation would address the inefficiencies, lack of innovation, and lack of competition caused by non-uniform state regulations of motor carriers. *Mendonca*, 152 F.3d at 1187. We have described this as the FAAAA's "principal purpose," namely, "prevent[ing] States from undermining federal deregulation of interstate trucking through a patchwork of state regulations" – with Congress particularly concerned about States enacting "barriers to entry, tariffs, price regulations, and laws governing the types of commodities that a carrier could transport." *Dilts*, 769 F.3d at 644 (citations and internal quotation marks omitted).

We have also detailed what was *not* intended by the FAAAA. "Congress did not intend to preempt generally applicable state transportation, safety, welfare, or business rules that do not otherwise regulate prices, routes, or services." *Id.* Rather, its "driving concern" was preventing States from replacing market forces with their own, varied commands, like telling carriers they had to provide services not yet offered in the marketplace. *See Dan's City*, 569 U.S. at 263–64. Thus, when assessing preemption, we are cognizant that, "[a]lthough Congress clearly intended FAAAA to preempt some state regulations of motor carriers who transport property, the scope of the pre-emption must be tempered by the presumption against the pre-emption of state police power regulations." *Dilts*, 769 F.3d at 643 (citation omitted). To this end, we have held that Congress did not intend to preempt laws that implement California's traditional

labor protection powers, and which affect carriers' rates, routes, or services in only tenuous ways. *Dilts*, 769 F.3d at 647–50 (meal and rest break laws); *Mendonca*, 152 F.3d at 1189 (prevailing wage law).

## B. The FAAAA Does Not Preempt the *Borello* Standard

With our task and that background in mind, we turn to assessing whether the Commissioner's use of the *Borello* standard has significant, and therefore preempted, impact or only tenuous impact on a carrier's prices, routes or service. Relying heavily on Supreme Court precedent, CTA contends that the FAAAA preempts the *Borello* standard because the Commissioner's use of it can replace freely-bargained, efficiency-driven contract terms with California's policy judgment about what those terms ought to be.

True, the Supreme Court has held state laws preempted when a *customer* invokes them to obtain certain *rates or services* beyond what was set forth in their contract with a carrier. *See generally Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 134 S. Ct. 1422 (2014); *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995). However, those cases did not announce a broad rule that preemption occurs whenever a state law touches any aspect of a carrier's contractual relationship with anyone. Instead, we have made clear that those cases are inapplicable, and so no preemption occurs, when the law is a generally applicable background regulation in an area of traditional state power that has no significant impact on a carrier's prices, routes, or services. *See Dilts*, 769 F.3d at 642–50; *Mendonca*, 152 F.3d at 1185–89. Despite CTA's arguments to the contrary, *Dilts* and *Mendonca* compel us to conclude that the *Borello* standard is not preempted. And this

conclusion finds support in the FAAAA's legislative history, as well as the California Supreme Court's view of the matter.

### 1. Interference with Customer Contracts at the Point of Sale

We begin with the Supreme Court decisions holding preempted state laws that interfered with a carrier's contractual relationship with its customers – on which CTA heavily relies. *See Ginsberg*, 134 S. Ct. at 1428–33; *Wolens*, 513 U.S. at 226–34. These cases did not announce a rule that preemption occurs whenever a state law effectively alters freely-negotiated contract terms; the preemption issues they addressed were, instead, quite distinct from the issue here.

In both *Ginsberg* and *Wolens*, customers objected to changes that an airline made to its "frequent flyer" program. *Ginsberg*, 134 S. Ct. at 1426–27 (objecting to being kicked out of frequent flyer program); *Wolens*, 513 U.S. at 224–25 (objecting to retroactive changes that devalued frequent flyer credits). The customers pointed to state laws, arguing that these laws compelled the air carrier to provide specific prices or services – like making flights or upgrades available on certain dates or for certain credit amounts – even if such obligations were absent from the parties' agreements. *Ginsberg*, 134 S. Ct. at 1431–33 (addressing a claim for breach of the covenant of good faith and fair dealing); *Wolens*, 513 U.S. at 226–27 (reviewing a consumer fraud act claim). In both cases, the Supreme Court held that the FAAAA preempted these state law claims because they would have resulted in a State's normative policies dictating what prices and services an airline had to offer to its customers. *Ginsberg*, 134 S. Ct. at 1431–33*; Wolens*,

513 U.S. at 227–28.**[6]**  Customers' breach of contract claims that sought merely to hold an airline to agreed-upon terms, however, were not preempted.  *Wolens*, 513 U.S. at 230–33.

CTA emphasizes that the line drawn is "between what the State dictates and what the [carrier] itself undertakes." *Wolens*, 513 U.S. at 233.  As explained in *Wolens*, a breach of contract claim against a carrier is cognizable because it enforces only the latter "with no enlargement or enhancement based on state laws or policies external to the agreement." *Id.*; *see also id.* at 228–29 & n.5.  Moreover, permitting such claims against carriers aligns with the ADA's goal of promoting reliance on market forces because "[m]arket efficiency requires effective means to enforce private agreements."  *Id.* at 230.  CTA urges us to focus on the fact that the *Borello* standard could replace efficiency-driven terms in its members' contracts with external ones found in California's labor laws (*e.g.*, *sua sponte* reallocating responsibility for truck maintenance costs from owner-operators to carriers).

CTA's focus on this delineation in the broadest sense misses the trees for the forest – and does not square with our task of assessing whether Congress clearly intended to preempt *Borello* by analyzing its effect on prices, routes, and services.   It is one thing to say market efficiencies are promoted when competitive forces compel a carrier to offer

---

**[6]** The results in *Wolens* and *Ginsberg* flowed logically from *Morales*, which held that the ADA preempted States from using their general consumer protection statutes to combat deceptive airline advertisements. *See* 504 U.S. at 387–91.  The States sought to use those statutes to enforce guidelines that mandated the content of airfare advertisements, and the prices and services an airline had to make available once it advertised certain fares.  *See id.*

certain *services or prices*, and a *customer* can then enforce these promises – but only these promises. *See Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1066 (9th Cir. 2017) (ruling that the ADA did not preempt breach of contract claim where airline freely undertook obligation to offer timely delivery of baggage). It does not follow that a state law will be preempted in every instance where it defeats any term in any carrier contract. Even if *Wolens* and *Ginsberg* draw a line between the permissible enforcement of contractual terms and the preempted enforcement of normative policies, that line does not control when the contractual relationship is between a carrier and its *workforce*, and the impact is on the *protections* afforded to that workforce.

## 2. Impacting Workforce Arrangements

Indeed, we have already explained that the details of *Wolens* and *Ginsberg* matter because Congress did not intend to hinder States from imposing normative policies on motor carriers as employers. *See Dilts*, 769 F.3d at 642–50; *Mendonca*. 152 F.3d at 1187–89. And *Dilts* and *Mendonca* all but dictate the result here.[7]

*Mendonca* held that California's Prevailing Wage Law (CPWL) is not preempted, 152 F.3d at 1187–89, and *Dilts* later held that California's meal and rest break requirements are not preempted, 769 F.3d at 642–50. In effect, the laws at-issue in these cases compelled new terms in motor carriers' agreements with their workers. To be sure, in *Dilts* and

---

[7] *Mendonca* was decided between *Wolens* and *Ginsberg*; *Dilts* was decided after both, and confirmed *Mendonca*'s continued vitality. 769 F.3d at 645.

*Mendonca* there was no dispute that the workers were employees. Still, we permitted California to interfere with the relationship between a motor carrier and its workforce. *Dilts* explicitly distinguished *Wolens* and *Ginsberg* based on where and how this interference occurs:

> Laws are more likely to be preempted when they operate at the point where carriers provide services to customers at specific prices.
>
> . . .
>
> On the other hand, generally applicable background regulations that are several steps removed from prices, routes, or services, such as prevailing wage laws or safety regulations, are not preempted, even if employers must factor those provisions into their decisions about the prices that they set, the routes that they use, or the services that they provide. Such laws are not preempted even if they raise the overall cost of doing business or require a carrier to re-direct or reroute some equipment. . . . Nearly every form of state regulation carries some cost. The statutory text tells us, though, that in deregulating motor carriers and promoting maximum reliance on market forces, Congress did not intend to exempt motor carriers from every state regulatory scheme of general applicability.

769 F.3d at 646 (citations omitted). We agree with the Commissioner that, in light of *Dilts* and *Mendonca*, CTA's position "defies logic." Our conclusion that Congress did not intend to preempt these generally applicable labor laws could be nullified if motor carriers have the unchecked ability to contract around these laws simply by obtaining owner-operators' consent to label them as independent contractors and thus exclude them from such protections.[8]

Similarly instructive is *Air Transport Ass'n of America v. City and County of San Francisco*, 266 F.3d 1064, 1070–75 (9th Cir. 2001), where we concluded that the ADA did not preempt a San Francisco ordinance barring city contractors from discriminating, even though it affected air carriers at San Francisco International Airport and could have increased their cost of doing business at that airport. The ordinance had the effect of "adding a contractual requirement" that interfered with an air carrier's relationship with its workforce because, for example, if it offered certain terms to an employee's spouse, it was compelled to provide the same benefits to another employee's domestic partner. *Id.* at 1069, 1073. What mattered, however, was that the ordinance did not constitute improper compulsion *in the preemption sense*. *Id.* at 1074. As we framed the inquiry there, "[t]he question is not whether the Ordinance compels or binds them into not discriminating; the question is whether the Ordinance compels or binds them to a particular price, route or service." *Id.*

---

[8] For example, CTA does not refute the Commissioner's claim that the Labor Code prevents an employee from waiving rest breaks or the right to be reimbursed for business expenses. *See* Cal. Labor Code §§ 219, 1194, 2804.

### 3. The *Borello* Standard's Impact on Workforce Arrangements

CTA contends that, nonetheless, if we look at the specific effects the *Borello* standard has on its members here, we will see that there *is* improper compulsion in the preemption sense. We reject this contention because the *Borello* standard does not compel the use of employees or independent contractors; instead, at most, it impacts CTA's members in ways that *Dilts* and *Mendonca* make clear are not significant, and so do not warrant preemption.

### a. Compelling Who Provides Services

CTA argues that a state law or policy compelling a carrier to use employees to provide its services is preempted. Even so, the *Borello* standard does not, by its terms, compel a carrier to use an employee or an independent contractor. Nor does CTA contend that the nature of the *Borello* standard compels the use of employees to provide certain carriage services.

This case is therefore wholly different from *American Trucking*. *See* 559 F.3d at 1053–57. There, in reversing the denial of a preliminary injunction, we concluded that the FAAAA likely preempted the Ports of Los Angeles and Long Beach's directive that carriers must use only employee drivers and give hiring preference to drivers with more experience. *Id.* As compared to the *Borello* standard, which sets a background rule for ensuring a driver is correctly classified, *American Trucking* stands for the obvious proposition that an "all or nothing" rule requiring services be performed by certain types of employee drivers and

motivated by a State's own efficiency and environmental goals was likely preempted. *Id.* at 1053–56.

For similar reasons, it is immaterial that other States have adopted the "ABC" test to classify workers, the application of which courts have then held to be preempted. *See Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 437–40 (1st Cir. 2016) (analyzing Massachusetts law). Like *American Trucking*, the "ABC" test may effectively compel a motor carrier to use employees for certain services because, under the "ABC" test, a worker providing a service within an employer's usual course of business will never be considered an independent contractor. *Id* at 438. For a motor carrier company, this means it may be difficult to classify drivers providing carriage services as independent contractors. *Id.* at 439. But California's common law test – as embodied in the *Borello* standard – is to the contrary. Whether the work fits within the usual course of an employer's business is one factor among many – and not even the most important one. *See Borello*, 769 P.2d at 404.[9] CTA has not alleged or shown how the *Borello* standard makes it difficult for its members to use independent contractors to provide their services.

---

[9] The First Circuit left in place the two other "prongs" of the "ABC" test, which align more closely with the *Borello* standard. *See* 813 F.3d at 433, 441 (classification depends on level of control and whether individual is regularly engaged in service being provided). The carrier in that case did not argue that those elements of the "ABC" test were preempted. *See id.* at 441. As previously discussed, we need not and do not decide whether the FAAAA would preempt using the "ABC" test to enforce labor protections under California law. *See* footnote 4 *supra*.

### b. Compelling or Foreclosing Prices, Routes, or Services

CTA also argues for preemption because of the potential impact on a motor carriers' financial arrangements with its drivers and their agreed-upon incentives; again, *Dilts* and *Mendonca* foreclose these arguments.

Specifically, CTA complains that, whereas owner-operators often control how their trucks are used and can accept or reject hauls offered by the carriers they are working with, an employee driver must accept a haul or face termination. In the relevant agreements, owner-operators are also responsible for expenses like maintenance, repair, parking, and fueling and then compensated at an agreed-upon rate; however, California law requires motor carriers to reimburse employee drivers for these expenses.

In *Mendonca*, we rejected similar arguments that CPWL was preempted because it would increase a carrier's prices by 25%, require it to change how it offered these services (*e.g.*, using independent owner-operators), and compel it to redirect and reroute equipment to compensate for lost revenue. 152 F.3d at 1189. *Mendonca* acknowledged that CPWL related to prices, routes, and services "in a certain sense," but relied on the Supreme Court's efforts in this arena "to preserve the proper and legitimate balance between federal and state authority." *Id*. Because CPWL was an area of traditional state regulation that did not "*acutely* interfer[e] with the forces of competition," it was not preempted. *Id*.

The question in *Dilts* was whether meal and rest break laws – either directly or indirectly – set prices, mandated or prohibited certain routes, or told motor carriers what services

they could or could not provide. 769 F.3d at 647. The answer was no. *Id.* at 647–50. *Dilts* recognized that a motor carrier may have to hire more workers in order to stagger breaks and operate continuously. *Id.* at 648. Rest breaks could also result in drivers taking longer to travel the same distance, meaning motor carriers would need to reallocate resources or face increased costs, like hiring more drivers, to maintain a particular service level. *Id.* And motor carriers would need to take drivers' breaks into consideration when scheduling services. *Id.* There still was no preemption – even though motor carriers would have to arrange operations and services based on what the law requires, and not only on what the market demands. *See id.* at 648–50.

The specific effects CTA discusses – such as reallocation of truck maintenance costs and a potential change in who sets drivers' hours – are indistinguishable from those recognized as permissible in *Dilts* and *Mendonca*. There is no allegation that if a current driver is found to be an employee, CTA's members will no longer be able to provide the service it was once providing through that driver, or that the route or price of that service will be compelled to change. At most, carriers will face modest increases in business costs, or will have to take the *Borello* standard and its impact on labor laws into account when arranging operations. "[T]he mere fact that a motor carrier must take into account a state regulation when planning services is not sufficient to require FAAAA preemption, so long as the law does not have an impermissible effect, such as binding motor carriers to specific services, making the continued provision of particular services essential to compliance with the law, or interfering at the point that a carrier provides services to its customers." *Dilts*, 769 F.3d at 649 (citations omitted).

Nothing in CTA's Complaint suggests that application of the *Borello* standard will have these effects.

### c.   Generally Applicable Labor Protections

Rather than explain why *Dilts* and *Mendonca* do not control, CTA attempts to undercut their reasoning by arguing that it is improper to focus on the fact that the *Borello* standard applies across all industries in an area traditionally reserved to the States.   The laws at issue in *Dilts* and *Mendonca* involved generally applicable labor protections, *i.e.*, an area of traditional state power, and this factor was critical in these cases – as it is here.  *See, e.g.*, *Dilts*, 769 F.3d at 642–43.  Aside from the fact that we are bound by *Dilts* and *Mendonca*, CTA's argument is also unavailing because it misapprehends the authority on which it relies.  *See Rowe*, 552 U.S. at 374; *see also Morales*, 504 U.S. at 386.

In *Rowe*, carriers hauling tobacco products risked liability under a Maine law unless they provided certain receipt and delivery verification services, like ensuring that the individual who purchased and received the tobacco was of legal age and that entities sending packages marked as containing tobacco were Maine-licensed tobacco retailers.  552 U.S. at 368–69, 372–73.   *Rowe* reflects a straightforward application of FAAAA preemption:  Maine could not require motor carriers to provide these tobacco-focused carriage services, which carriers may not have provided – or may have gotten rid of – if left unregulated.  *Id.* at 372–73.  In so holding, *Rowe* rejected Maine's argument that the importance of preventing underage smoking and promoting public health justified an *exception* to FAAAA preemption.  *Id.* at 374–76.  As *Dilts* observed, a law reflecting a State's traditional police power will not be immune from preemption "if Congress in fact

contemplated [its] preemption."   769 F.3d at 643; *accord Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 946 (2016).

The Commissioner, however, is not seeking an *exception* to preemption; she argues there is no preemption in the first place because there is no clear intent to usurp the well-established test for triggering a State's traditional labor protection powers.  In *Rowe*, Maine targeted only the carriage of tobacco products, enlisting motor carriers to accomplish its public health goals by telling carriers how to complete tobacco pick-up and delivery within that State.  *Id.* at 373–75.  To the contrary, the *Borello* standard is more comparable to a state regulation that *Rowe* described as not preempted, namely, one that "broadly prohibits certain forms of conduct and affects, say, truckdrivers, only in their capacity as members of the public . . . ."  552 U.S. at 375.

This is not to say that the general applicability of a law is, in and of itself, sufficient to show it is not preempted.  *See Morales*, 504 U.S. at 386.  While general applicability is not dispositive, *Dilts* and *Rowe* still instruct that it is a relevant consideration because it will likely influence whether the effect on prices, routes, and services is tenuous or significant.  What matters is not solely that the law is generally applicable, but where in the chain of a motor carrier's business it is acting to compel a certain result (*e.g.*, consumer or workforce) and what result it is compelling (*e.g.*, a certain wage, non-discrimination, a specific system of delivery, a specific person to perform the delivery).  As we have already detailed, CTA's Complaint is devoid of any allegations that could demonstrate that the Commissioner's application of the *Borello* standard, in any significant way, impacts its members' prices, routes, or services.

### 4. Historical Context and Preemption in the Present

Our conclusion today brings us in accord with the California Supreme Court – and, as that court discussed, Congress' intent for the FAAAA's preemptive reach. *See generally People ex rel. Harris v. Pac Anchor Transp., Inc.*, 329 P.3d 180 (Cal. 2014).

*Pac Anchor* held that the FAAAA did not preempt a claim under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, premised on drivers being misclassified as independent contractors. *Id.* at 187–90. As with the Commissioner's use of the *Borello* standard, the UCL claim sought only "to ensure that employers properly classify their employees or independent contractors in order to conform to state law." *Id.* at 190.

*Pac Anchor* relied on *Mendonca*'s discussion of indirect evidence of Congress' intent, which we find persuasive. *See id.* When enacting the FAAAA, Congress identified ten jurisdictions (nine States and the District of Columbia ("States")) that did not regulate intrastate prices, routes, and services. *See Mendonca*, 152 F.3d at 1187 (citing H.R. Conf. Rep. 103-677, at 86 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1758). Because seven of these ten States had prevailing wage laws similar to CPWL, this was "indirect evidence" Congress did not intend to preempt that law – which was reinforced by the fact that there was no "*positive* indication in the legislative history that Congress intended

preemption in this area of traditional state power." *Id*. at 1187–88.[10]

As relevant here, eight out of the ten States that Congress initially identified had laws for differentiating between an employee and an independent contractor. *Pac Anchor*, 329 P.3d at 190. Moreover, nothing in the FAAAA's legislative history indicated that Congress intended to preempt the traditional power to protect employees or the necessary precursor to that power, *i.e.*, identifying who is protected. *See id.* This indirect evidence provides further support that Congress did not intend to foreclose States from applying common law tests to discern who is entitled to generally applicable labor protections.[11] For these additional reasons, then, we conclude that the FAAAA does not bar the Commissioner's application of the *Borello* standard to claims within her jurisdiction involving motor carriers.

## CONCLUSION

The FAAAA does not preempt the Commissioner from using the *Borello* standard with respect to motor carriers

---

**[10]** While *Rowe* discredited reliance on this type of evidence of indirect intent, it did so in the context of rejecting a public health exception for Maine's law that directly regulated carrier services. 552 U.S. at 374–75. Such an exception would have been contrary to the FAAAA's purpose of avoiding "a patchwork of state service-determining laws" regulating how to carry certain products. *Id.* at 373–75. Again, the Commissioner is not arguing for an *exception*. And *Dilts* confirmed that *Rowe* did not call *Mendonca* into question. 769 F.3d at 645.

**[11]** Even if the relevant tests vary across States, *Dilts* instructs that this would be a "permissible" patchwork under the FAAAA. *See* 769 F.3d at 647–48 & n.2.

because this generally applicable, common law test is not "related to" motor carriers' prices, routes, or services. Accordingly, we affirm the district court's order of dismissal.

**AFFIRMED.**