Filed 5/10/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JOHN QUINN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LPL FINANCIAL LLC,<br><br>    Defendant and Respondent. | B313414<br><br>Los Angeles County<br>Super. Ct. No. 20STCV06589 |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Sotelo, Judge. Affirmed.

Clapp & Lauinger and James F. Clapp; Wynne Law Firm and Edward J. Wynne for Plaintiff and Appellant.

Seyfarth Shaw, Jon D. Meer and Paul J. Leaf for Defendant and Respondent.

_____

As a matter of constitutional law, we uphold a statute that retroactively governs worker classification. Statutory citations are to the Labor Code.

I

Distinguishing between employees and independent contractors has been a challenge for a long time.

In a 1944 case about Los Angeles "newsboys," the Supreme Court of the United States reviewed the "long and tortuous history" behind a then-reigning test, which was notoriously uncertain in application. (*Board v. Hearst Publications* (1944) 322 U.S. 111, 113, 120.) The Supreme Court bemoaned this uncertainty: "Few problems in the law have given greater variety of application and conflict in results than the cases arising in the *borderland* between what is clearly an employer-employee relationship and what is clearly one of independent, entrepreneurial dealing." (*Id.* at p. 121, italics added.)

The California Supreme Court also has struggled to map this borderland. Striving to mark precise boundaries, our high court has surveyed this terrain time and again. (E.g., *Empire Star Mines Co. v. Cal. Employment Com.* (1946) 28 Cal.2d 33, 43–46 [miners]; *S. G. Borello & Sons, Inc. v. Dept. of Industrial Relations* (1989) 48 Cal.3d 341, 349–360 (*Borello*) [cucumber harvesters]; *Martinez v. Combs* (2010) 49 Cal.4th 35, 49–77 [strawberry workers]; *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530–540 [newspaper delivery].)

These efforts were not conclusive.

In 2018, the court tried again in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 (*Dynamex*).

Today, *Dynamex* stands as governing law in some respects. In other ways, however, it merely intensified a whirlpool: the year it issued, *Dynamex* sparked varied responses, which are continuing. The dust has yet to settle completely.

What was *Dynamex*?

Delivery drivers said they were employees of Dynamex, which had, they alleged, violated a state wage order governing their employment. Dynamex countered that the wage order did not apply because its drivers were independent contractors rather than employees. The court held, for claims arising under wage orders, a so-called ABC test would govern. The opinion limited its review to wage orders and expressed no view about other employment claims. (*Dynamex*, *supra*, 4 Cal.5th at pp. 916 & fn. 5, 924–925, 942; see also *id.* at pp. 925–926 & fns. 8–9, 952–953 [recounting origin, nature, and variety of wage orders].)

*Dynamex* replaced one multifactor test with another. The new ABC test was that a worker would be considered an employee under the wage order unless the company satisfied factors the opinion identified as Part A, Part B, and Part C: hence, the ABC test. (*Dynamex*, *supra*, 4 Cal.5th at pp. 955–963.) The court was concerned employers were misclassifying employees as independent contractors. The court adopted the ABC test with the "basic objective" of securing at least minimal wages and "a subsistence standard of living" for workers. (*Id.* at pp. 913, 952, 955–957, 964.)

Plaintiff John Quinn likes *Dynamex*'s ABC test and wants it to govern his case.

The 2018 *Dynamex* decision was not the last word in this long-running conversation.

That same year, legislators introduced a bill targeting *Dynamex*. This bill, known as Assembly Bill 5 (AB 5), passed in 2019 and took effect in 2020. (Stats. 2019, ch. 296 (2019-2020 Reg. Sess.); Lab. Code, § 2775, subd. (b)(1); see *American Society of Journalists and Authors, Inc. v. Bonta* (9th Cir. 2021) 15 F.4th 954, 957–959 (*American Society*) [describing AB 5].)

AB 5 simultaneously codified, broadened, and narrowed *Dynamex*. It codified *Dynamex* by stating the ABC test in a statute. (See Stats. 2019, ch. 296, § 1(a) & (d).) The bill broadened *Dynamex* in two ways: by extending its reach beyond wage orders and by empowering prosecutors to enforce the rule. And it narrowed *Dynamex* by creating a range of exemptions to the ABC test. (See §§ 2775, subd. (b)(1), 2776–2784, 2786.) A different test, the "*Borello* test," would govern the exceptions. (See §§ 2775, subd. (b)(3), 2783.)

AB 5 did not settle everything, either. The Legislature returned to the field by enacting AB 170 (Stats. 2019, ch. 415, § 1) and then AB 2257 (Stats. 2020, ch. 38, § 2). Both statutes created new exemptions from the ABC test.

Nor was the Legislature the only theater of action. On October 29, 2019, a group proposed Proposition 22, which took aim at an aspect of *Dynamex* and AB 5. In November 2020, voters approved Proposition 22 and thereby modified the landscape in various respects. (See *Castellanos v. State of Cal.* (2023) 89 Cal.App.5th 131, 142–145 (*Castellanos*) [describing Proposition 22].)

There also were developments in the *judicial* arena.

One California court enjoined the operation of Proposition 22; a later, higher, and divided court reversed much of the injunction. (See *Castellanos, supra,* 89 Cal.App.5th at pp. 146–212.)

A Ninth Circuit opinion upheld the constitutionality of AB 5, but a later Ninth Circuit decision went a different direction. (Compare *American Society, supra*, 15 F.4th at p. 966 ["section 2778 permissibly subjects workers in different fields to different rules"] with *Olson v. State of Cal.* (9th Cir. 2023) 62

4

F.4th 1206, 1219 (*Olson*) ["Plaintiffs plausibly alleged that A.B. 5, as amended, violates the Equal Protection Clause for those engaged in app-based ride-hailing and delivery services"].)

Quinn set sail on this stormy sea. In February 2020—after the enactment of AB 5 and the filing of Proposition 22 but before the effective date of AB 2257—Quinn filed suit against LPL Financial LLC under the Private Attorneys General Act (PAGA).

Quinn and LPL stipulated to facts and sought summary adjudication of the fulcrum issue. The stipulated facts are concise, as follows (omitting paragraphs and related lettering):

"[The new statute] codified and clarified the 'ABC Test' for independent contractor classification adopted in Dynamex [ ]. [The statute] also included multiple exemptions to the 'ABC Test,' including, but not limited to, an exemption for 'securities broker-dealer[s] or investment adviser[s] or their agents and representatives that are registered with the Securities and Exchange Commission or the Financial Industry Regulatory Authority.' [Citation.] For those occupations, [the new statute] rejects the 'ABC Test' in favor of the 'Common Law Control Test' set forth in [*Borello*]. The legal requirements differ for determining independent contractor classification, depending on whether the facts are governed by the 'ABC Test' or the *'Borello* Test.' LPL is a registered broker-dealer and registered investment adviser registered with Financial Industry Regulatory Authority, Inc. ('FINRA') and the Securities Exchange Commission. At all times relevant to this action, Quinn and all allegedly aggrieved individuals for purposes of this action (the 'Financial Professionals') were 'securities broker-dealer[s] or investment adviser[s] or their agents and representatives that are registered with the Securities and Exchange Commission or

5

the Financial Industry Regulatory Authority[.]'  Thus, the Financial Professionals affiliated with LPL fall within the statutory exemption to the 'ABC Test'."

There is one more stipulated fact:  "The Parties agree that, on its face, Labor Code § 2750.3(i)(2) makes the exemption set forth in § 2750.3(b)(4) retroactive, such that it would cover the entire proposed PAGA period in this action.  However, Quinn claims both of those sections are unconstitutional and thus unenforceable.  LPL claims both of those sections are constitutional and thus enforceable."

The parties did not stipulate to the *results* of these two tests—the ABC test versus the *Borello* test.  There is no stipulation Quinn is an employee under one test or an independent contractor under another.  Rather the dispute is about *how* a court should make that determination.  This controversy is over means, not ends.  Whether Quinn was an employee or an independent contractor is, as yet, unknown.

LPL moved for summary adjudication.  The pertinent stipulated issues were whether the statutory exemption for securities broker-dealers and investment advisors, and its retroactive application, are constitutional.  The trial court upheld the statute as constitutional.  Quinn appealed.

## II

The challenged provisions are constitutional.

The pertinent statute is as follows.  Section 2775 identifies *Dynamex* and *Borello* by case citations and states the ABC test shall govern the Labor Code.  (§ 2775, subds. (a) & (b).)  Section 2783 states the holding in *Dynamex* does *not* apply to a list of defined occupations; instead, people in those occupations are governed by *Borello*.  One of the defined exceptions is for

6

securities broker-dealers or investment advisers or their agents and representatives that are registered with the Securities and Exchange Commission or the Financial Industry Regulatory Authority.  (§ 2783, subd. (d)(1).)  Section 2785 makes this exemption retroactive.  (§ 2785, subd. (b).)

We independently review constitutional questions.

## A

Equal protection is the ground for Quinn's first challenge. He says the statute violates equal protection by applying the ABC test to others but not to him.

We apply federal law.  Neither party suggests state and federal law have different equal protection tests.  It does appear, for this issue, that California state courts embrace the federal test.  (Cf. *Warden v. State Bar* (1999) 21 Cal.4th 628, 648, fn. 12 (*Warden*) ["under both the federal and state equal protection clauses, the rational relationship test remains a restrained, deferential standard"]; see also *People v. Chatman* (2018) 4 Cal.5th 277, 287, 288; *Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1113 [when urged to use California's state equal protection clause "to articulate a unique set of state law specific principles, we've declined"] (conc. opn. of Kruger, J.).)

Quinn's challenge requires a return to basics.

Reigning equal protection analysis remains, in significant measure, a reaction to the universally-acknowledged constitutional error in *Lochner v. New York* (1905) 198 U.S. 45 (*Lochner*).  Indeed, "[t]he spectre of *Lochner* has loomed over most important constitutional decisions, whether they uphold or invalidate governmental practices."  (Sunstein, *Lochner's Legacy* (1987) 87 Colum. L.Rev. 873, 873.)

What, exactly, was the hated *Lochner*—this candidate for

7

"the most widely reviled decision of the last hundred years"? (Strauss, *Why Was Lochner Wrong?* (2003) 70 U.Chi. L.Rev. 373, 373, see also *ibid.* ["*Lochner* is one of the great anti-precedents of the twentieth century.  You have to reject *Lochner* if you want to be in the mainstream of American constitutional law today."].)

Lochner overturned, on federal constitutional grounds, a state regulation capping bakers' work weeks at 60 hours.  The *Lochner* majority posed the question this way:  "Is this a fair, reasonable, and appropriate exercise of the police power of the state, or is it an unreasonable, unnecessary, and arbitrary interference with the right of the individual to his personal liberty, or to enter into those contracts in relation to labor which may seem to him appropriate or necessary for the support of himself and his family?"  The *Lochner* majority ruled the 60-hour cap was the latter and struck it down.  (*Lochner*, *supra*, 198 U.S. at pp. 46–52, 56, 64.)

In a timeless dissent, Justice Holmes wrote:

"This case is decided upon an economic theory which a large part of the country does not entertain.  If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind.  But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law.  It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious, or if you like as tyrannical, as this, and which, equally with this, interfere with the liberty to contract. . . .  Some of these laws embody convictions or prejudices which judges are likely to share.  Some may not.  But a Constitution is not

intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of *laissez faire*.  It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, and even shocking, ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States." (*Lochner, supra*, 198 U.S. at pp. 75–76 (dis. opn. of Holmes, J.).)

Future Supreme Courts resoundingly agreed with Holmes.  Praising him, a later Supreme Court wrote, "it is up to legislatures, not courts, to decide on the wisdom and utility of legislation.  There was a time when the Due Process Clause was used by this Court to strike down laws which were thought unreasonable, that is, unwise or incompatible with some particular economic or social philosophy. . . .  This intrusion by the judiciary into the realm of legislative value judgments was strongly objected to at the time, particularly by Mr. Justice Holmes . . . .  The doctrine that prevailed in Lochner . . . and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded.  We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.  As this Court stated in a unanimous opinion in 1941, 'We are not concerned . . . with the wisdom, need, or appropriateness of the legislation.' [Citation.]  Legislative bodies have broad scope to experiment with economic problems, and this Court does not sit to subject the state to an intolerable supervision hostile to the basic principles of our government and wholly beyond the protection

9

which the general clause of the Fourteenth Amendment was intended to secure. . . . Nor is the statute's exception . . . a denial of equal protection . . . ." (*Ferguson v. Skrupa* (1963) 372 U.S. 726, 729–732, internal quotation marks and citations omitted (*Skrupa*); see also *Williamson v. Lee Optical* (1955) 348 U.S. 483, 488 (*Williamson*); *Dandridge v. Williams* (1970) 397 U.S. 471, 484.)

This renunciation of *Lochner* endured. (E.g., *Santa Monica Beach, Ltd. v. Superior Ct.* (1999) 19 Cal.4th 952, 970 [citing *Skrupa*]; *Briggs v. Brown* (2017) 3 Cal.5th 808, 828 [same].)

Unless a suspect classification or some other basis triggers heightened scrutiny, modern equal protection analysis applies the rational basis test: "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." (*Williamson, supra*, 348 U.S. at p. 488.)

"[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any *reasonably conceivable* state of facts that could provide a rational basis for the classification." (*Warden, supra*, 21 Cal.4th at p. 644, italics added.) The constitutional inquiry ends if there are plausible reasons for the classification. (*Ibid.*)

This law has a rational basis. "Financial professionals," as Quinn's stipulation described them, are professionals. A legislature rationally could believe professionals like Quinn, who ask people to trust them with wealth and finances, have more skill and bargaining power than the average worker, and therefore are less vulnerable to exploitation by misclassification as independent contractors. (Cf. *Dynamex, supra*, 4 Cal.5th at p.

10

952 [wage statutes are premised on the generalization workers have less bargaining power than employers]; see also Stats. 2019, ch. 296, § 1(c) & (e) [legislative findings showing AB 5, like *Dynamex*, aims to alleviate misclassification and exploitation].)

Professionals with superior bargaining power may need less protection in the marketplace than others. A labor regulation treating financial professionals differently from others is rational.

Quinn agrees the rational basis test governs, but he would apply it in a nondeferential way. This approach recapitulates the error of *Lochner*.

For instance, Quinn argues *all* workers need the protection of the ABC test. This policy question is for the Legislature, which decided a different test should govern many professions.

Quinn faults the legislation for failing to *state* the rational basis for the challenged exemption in its text or legislative history. This demand for a legislative recital is unfounded. Any reasonably conceivable rationale suffices. (*Warden, supra*, 21 Cal.4th at pp. 641 & 644.)

Quinn argues the statutory exemptions resulted from lobbying efforts. If this were the test, a supposedly deferential inquiry would doom much and possibly all legislation.

Quinn maintains the registration aspect of the exemption creates a nonsensically narrow classification. He claims other licensed workers in the financial world fall outside of the exemption because they are unregistered with the Securities and Exchange Commission or the Financial Industry Regulatory Authority and therefore operate under the ABC test. In one sentence of his opening brief, Quinn lists loan officers, certified financial planners, financial examiners, market research

analysts, and chartered wealth managers.  He suggests these licensed financial workers are interchangeable for purposes of the statute, but only registered financial workers like him are exempted from the ABC test, and this discrimination deprives him of equal protection.

Quinn's attack is not deferential.  Legislation may recognize different categories of people within a larger classification who present varying degrees of risk of harm, and properly may limit a regulation to those classes for whom the need for regulation is thought to be more important.  (*Warden, supra*, 21 Cal.4th at p. 644.)

"Evils in the same field may be of different dimensions and proportions, requiring different remedies.  Or so the legislature may think.  [Citation.]  Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." (*Williamson*, *supra*, 348 U.S. at p. 489.)

Defining classes of people subject to legal requirements inevitably places those with almost equally strong claims on the other side of the line.  Whether the line could or should have been drawn differently is a matter for legislative, not judicial, consideration. (*Warden*, *supra*, 21 Cal.4th at p. 645.)  Problems of government may justify or require rough accommodations, and even illogical and unscientific ones. (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 487.)

In another thrust, Quinn faults the trial court for offering no evidence to support its analysis.  Again, this misunderstands the deference of rational-basis review.  A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by empirical data. (*Warden*, *supra*, 21

12

Cal.4th at p. 650.)

In short, the trial court was right to defend this statute against Quinn's equal protection attack.

In so holding, we join with *Whitlach v. Premier Valley Inc.* (2022) 86 Cal.App.5th 673, 706–708, which concerned real estate agents, and *American Society, supra*, 15 F.4th at pages 964–966, which involved freelance writers and photographers. These equal protection analyses support our holding.

A different recent decision, *Olson*, has no application here. The *Olson* decision seemed to make one legislator's statement a basis for doubting a law. (See *Olson, supra,* 64 F.4th at pp. 1219–1220.) For support, *Olson* cited *U.S. Department of Agriculture v. Moreno* (1973) 413 U.S. 528, 534 & 538, which invalidated a food stamp exemption designed to cut off aid to "hippies" and "hippie communes." (*Id.* at p. 534.) That legislation was unconstitutional because it was "wholly without any rational basis." (*Id.* at p. 538.) Quinn's case is different: it is rational to think people licensed to work as financial professionals by the Securities and Exchange Commission or the Financial Industry Regulatory Authority have more skill and bargaining power than the average worker and do not need a new classification test.

In sum, this statute does not violate equal protection.

B

Due process is the basis for Quinn's second challenge. Quinn argues the 2019 legislation, by making the challenged exemption retroactive, violated his right to due process because its retroactivity deprived him of a vested right.

Recall the pertinent exemption specifies the key determination for these financial professionals shall be governed

13

by the *Borello* test rather than the ABC test.  The statute makes this rule retroactive.  Quinn says this retroactivity is unconstitutional.

Quinn's opening brief cites no precedent giving him a "vested right" to a particular legal test or presumption.  Courts and legislatures routinely change or modify legal tests.  For courts, this is the method of the common law:  continual and incremental legal adjustments to newly-encountered fact patterns—adjustments that then stand as precedents for the future.  Absent precedent, Quinn's challenge lacks an authoritative footing.  (Cf. *Graczyk v. Workers' Comp. Appeals Bd.* (1986) 184 Cal.App.3d 997, 1006 ["[A]pplicant's inchoate right to benefits under the workers' compensation law is wholly statutory and had not been reduced to final judgment before the Legislature's [later statute] . . . clarifying the employee status of athletes.  Hence, applicant did not have a vested right, and his constitutional objection has no bearing on the issue."].)

The decisions Quinn does cite do not cover his situation. *Roberts v. Wehmeyer* (1923) 191 Cal. 601, 603 concerned vested rights to an interest in a house.  *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 586 and footnotes 1 and 2 (*Bouquet*) concerned vested rights to "earnings and accumulations."  *In re Marriage of Buol* (1985) 39 Cal.3d 751, 755, 757 (*Buol*) was about vested rights to a house held as separate property.

None of these cases is authority for a constitutionally vested right in anything as ephemeral as a legal test or presumption.

Even less helpful to Quinn is his citation of *Campbell v. Holt* (1885) 115 U.S. 620, 628 ["We certainly do not understand that a right to defeat a just debt by the statute of limitations is a

14

vested right, so as to be beyond legislative power in a proper case."].

Quinn claims he gained vested rights as an employee at the time he worked for LPL, particularly the right to employer reimbursement of his business expenses.  This claim begs the question:  was Quinn an employee or an independent contractor?  No legal test—*Borello* or ABC or some other—has determined Quinn's status.  The trial court never made this determination.  Quinn's briefs do not ask us to undertake this analysis, and we do not.  Whether Quinn had rights as an employee depends on whether he *was* an employee, and that question remains open.

Other cases Quinn cites do not engage constitutional law at all.  *Cortez v. Purolator* (2000) 23 Cal.4th 163, 173–178 (*Cortez*) held that unlawfully withheld wages may be recovered as restitution in cases arising under California's unfair competition statutes.  Quinn's case does not involve these statutes.  *Cortez*, in passing, did cite *Loehr v. Ventura County Community College District* (1983) 147 Cal.App.3d 1071, 1080 (*Loehr*) and in a parenthetical description of that case quoted a sentence from it describing earned wages as "vested" rights. (*Cortez, supra*, 23 Cal.4th. at p. 178.)  But the word "vested" assumes different meanings in different contexts.  (*Bouquet, supra,* 16 Cal.3d at p. 591 fn. 7.)  Neither *Cortez* nor *Loehr* dealt with constitutional law.

Given this absence of binding constitutional authority, we do not extend constitutional doctrine to cover Quinn's case.

Two reasons counsel special caution.

First, Quinn gives us no constitutional logic supporting his proposal to invade legislative authority.  Why should Quinn be able to freeze a shifting legal landscape at a moment he selects

15

for personal tactical advantage?  Generally speaking, the doctrine of "vested rights" protects certain "settled" expectations. (Tribe, American Constitutional Law (1978) pp. 456–457 & fn. 10.)  But objectively, Quinn's fleeting expectations could not have counted as "settled" during this interval of rapid legal development.  (Cf. *California Trucking Assn. v. Su* (9th Cir. 2018) 903 F.3d 953, 959 fn. 4 ["*Dynamex* did not purport to replace the *Borello* standard in every instance where a worker must be classified as either an independent contractor or an employee for purposes of enforcing California's labor protections."].)

Second, unlike the situation with equal protection law, there may be a large divergence between state and federal substantive due process doctrines.  (Compare *Buol, supra*, 39 Cal.3d at pp. 758–760 [no mention of rational basis test] with 2 Rotunda and Nowak, Treatise on Constitutional Law-Substance and Procedure, (2022) § 15.9(a)(iv) ["The Supreme Court [of the United States], in a series of cases that spanned two-thirds of the twentieth century, established the principle that retroactive legislation will violate due process only if the legislation does not have a *rational relationship* to a legitimate government interest." Italics added.]; cf. Note, *The Variable Quality of a Vested Right* (1925) 34 Yale L.J. 303, 309 ["But whatever theory be adopted, the difficulty that causes such a volume of disagreement . . . is the chameleon character of the term 'property right' or 'vested right':  the fact that it is not an absolute standard, but a variant which each man, layman, legislator, and judge, determines individually out of his own background."].)

The parties do not identify a justification for this apparent doctrinal incongruity.  We are not aware of a stated rationale for

16

the doctrinal divergence, if indeed there is one today.

It is a grave thing for unelected judges to strike down the work of elected representatives.  Earlier we quoted Holmes's statement about the right of a majority to embody its opinions in law.  Where no binding authority compels us, this countermajoritarian difficulty restrains us.

These reasons lead us respectfully to decline to follow a federal opinion on which Quinn relies.  (See *Hall v. Cultural Care USA* (N.D.Cal. July 22, 2022, 3:21-CV-00926-WHO) 2022 WL 2905353, at \*4–\*5, *modified on reconsideration* (Aug. 31, 2022), 2022 WL 3974258 (*Hall*).)  The *Hall* decision cited *Buol, Cortez,* and *Loehr* as authority for declaring section 2785 a violation of due process.  (*Id.* at p. \*4.)  We have explained how these cases do not support the result Quinn seeks.

## DISPOSITION

We affirm the summary adjudication and resulting stipulated judgment.  We award costs to LPL Financial LLC.

WILEY, J.

We concur:

GRIMES, Acting P. J.

VIRAMONTES, J.

17