**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALLEN MILLER, *Plaintiff-Appellant*, v. C.H. ROBINSON WORLDWIDE, INC.; RONEL R. SINGH; RHEAS TRANS, INC.; KUWAR SINGH, DBA RT Service, *Defendants-Appellees*, and COSTCO WHOLESALE CORPORATION; LOTUS FOODS, INC.; PRIDE INDUSTRIES, *Defendants.* | No. 19-15981 D.C. No. 3:17-cv-00408-MMD-WGC OPINION |

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, Chief District Judge, Presiding

Argued and Submitted July 8, 2020
Seattle, Washington

Filed September 28, 2020

Before:  Ferdinand F. Fernandez and Jacqueline H.
Nguyen, Circuit Judges, and Susan R. Bolton,[*]
District Judge.

Opinion by Judge Nguyen;
Partial Concurrence and Partial Dissent by
Judge Fernandez

---

## SUMMARY[**]

---

### Federal Aviation Administration Authorization Act of 1994

The panel reversed the district court's dismissal, based on the Federal Aviation Administration Authorization Act of 1994 ("FAAAA")'s preemption, of plaintiff's state law claim alleging that C.H. Robinson Worldwide, Inc. negligently selected an unsafe motor carrier resulting in plaintiff's serious injuries in a motor vehicle accident.

The FAAAA preempts state laws that are "related to a price, route, or service of any . . . broker," unless one of the FAAAA's exceptions applies.  The district court found plaintiff's claim preempted under the FAAAA because it was "related to" C.H. Robinson's services and did not fall within the exception for "the safety regulatory authority of a State with respect to motor vehicles."

---

[*] The Honorable Susan R. Bolton, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel agreed with the district court that plaintiff's claim was "related to" C.H. Robinson's broker services, but held that the district court erred in holding that the safety exception did not apply. The panel held that in enacting the exception, Congress intended to preserve the States' broad power over safety, a power that included the ability to regulate conduct not only through legislative and administrative enactments, but also through common law damages. The panel further held that plaintiff's claim also had the requisite "connection with" motor vehicles because it arose out of a motor vehicle accident.

The panel concluded that negligence claims against brokers, to the extent that they arise out of motor vehicle accidents, have the requisite "connection with" motor vehicles. Therefore, the safety exception applied to plaintiff's claim against C.H. Robinson.

Judge Fernandez concurred in parts I, II, and III A, B, C.1 of the majority opinion, and dissented from part C.2. Judge Fernandez would hold that plaintiff's claim did not come within the safety exception of 49 U.S.C. § 1450(c)(2)(A) because as a broker, C.H. Robinson and the services it provided had no direct connection to motor vehicles or their drivers; and he would affirm the district court's decision.

---

**COUNSEL**

Jeffery I. Ehrlich (argued), The Ehrlich Law Firm, Claremont, California; Matthew L. Sharp, Matthew L. Sharp Ltd., Reno, Nevada; Michael Jay Leizerman and Rena Mara Leizerman, Leizerman & Associates, Toledo, Ohio; for Plaintiff-Appellant.

Daniel F. Polsenberg (argued) and Abraham G. Smith, Lewis Roca Rothgerber Christie LLP, Las Vegas, Nevada; Michael E. Sullivan, Michael A. Burke, and Therese M. Shanks, Robison Sharp Sullivan & Brust, Reno, Nevada; for Defendants-Appellees.

**OPINION**

NGUYEN, Circuit Judge:

Allen Miller ("Miller") suffered serious injuries when he was struck by a semi-tractor trailer while driving near Elko, Nevada. Miller sued C.H. Robinson Worldwide, Inc. ("C.H. Robinson"), the freight broker that arranged for the trailer to transport goods for Costco Wholesale, Inc. ("Costco"). Miller alleges that C.H. Robinson negligently selected an unsafe motor carrier.

The Federal Aviation Administration Authorization Act of 1994 (the "FAAAA") preempts state laws that are "related to a price, route, or service of any . . . broker," unless one of the FAAAA's exceptions applies. The district court found Miller's claim preempted under the FAAAA, reasoning that it is "related to" C.H. Robinson's services and does not fall within the exception for "the safety regulatory authority of a State with respect to motor vehicles."

We agree with the district court that Miller's claim is "related to" C.H. Robinson's services. Brokers arrange for transportation by motor carrier, and Miller alleges that C.H. Robinson was negligent in performing that service. But we hold that the district court erred in holding that the safety exception does not apply. In enacting that exception, Congress intended to preserve the States' broad power over safety, a power that includes the ability to regulate conduct

not only through legislative and administrative enactments, but also though common-law damages awards.  Miller's claim also has the requisite "connection with" motor vehicles because it arises out of a motor vehicle accident. We therefore reverse and remand.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

C.H. Robinson is a company that is "regularly engaged in the business of shipping, brokering, and logistics."  C.H. Robinson selected Kuwar Singh d/b/a RT Service ("RT Service") and/or Rheas Trans, Inc. ("Rheas Trans") to transport Costco's shipment.  RT Service and Rheas Trans are federally licensed motor carriers.  The driver of the semi-tractor trailer, Ronel Singh, was employed by RT Service and/or Rheas Trans at the time of the collision.

Singh lost control of the trailer while driving in icy conditions on I-80 near Elko, Nevada.  The trailer crossed over the median into oncoming traffic and collided with Miller's vehicle, and Miller "became lodged and pinned" under the trailer.  Miller suffered extensive injuries in the collision, and he is now quadriplegic.

In June 2017, Miller sued, among others, C.H. Robinson, RT Service, Rheas Trans, Singh, and Costco.[1]  Thereafter, Miller filed an amended complaint.  Relevant here, the amended complaint alleges that C.H. Robinson breached its "duty to select a competent contractor to transport" Costco's load "by retaining incompetent, unfit or inexperienced contractors or sub-haulers to arrange and/or take th[e] load."

---

[1] The parties stipulated to Costco's dismissal in September 2017.

It alleges that C.H. Robinson "knew or should have known" of RT Service's and Rheas Trans's "incompetence" because

> [T]here were red flags . . . including that [RT Service] and/or Rheas Trans have a history of safety violations; over 40% of their trucks have been deemed illegal to be on the road when stopped for random inspections; they have been cited numerous times for hours of service violations and false log books; and their percentage of out of service violations is twice that of the national average.

In July 2018, C.H. Robinson moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), arguing that the FAAAA preempts Miller's negligence claim. The district court granted the motion, concluding that the claim "sets out to reshape the level of service a broker must provide in selecting a motor carrier to transport property." For instance, "to avoid negligence liability, a broker would consistently need to inspect each motor carrier's background," and "such additional inspection would result in state law being used to, at least indirectly, regulate the provision of broker services by creating a standard of best practices." The district court went on to hold that Miller's claim does not fall within the exception for "the safety regulatory authority of a State with respect to motor vehicles." *See* 49 U.S.C. § 14501(c)(2)(A). The court reasoned that this exception does not "permit[] a private right of action—allowing for Miller to essentially do the state's work and enforce the state's police power." The court also found significant the fact the exception "is silent regarding broker services."

Thereafter, Miller settled with the remaining defendants. The court entered judgment, and this appeal timely followed.

## II.  JURISDICTION AND STANDARDS OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1332, and we have jurisdiction pursuant to 28 U.S.C. § 1291.  We review questions of preemption de novo.  *Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 958 (9th Cir. 2018).  We also review de novo an order granting a Rule 12(c) motion for judgment on the pleadings.  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

## III.  DISCUSSION

## A.  The "Related to" Test for FAAAA Preemption

"In considering the preemptive scope of a statute, congressional intent 'is the ultimate touchstone.'"  *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 642 (9th Cir. 2014) (quoting *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1040 (9th Cir. 2007)).  We primarily discern Congress's intent "from the language of the preemption statute and the statutory framework surrounding it," but we may also consult "the structure and purpose of the statute as a whole."  *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996)).  The scope of a preemption clause is also tempered by "the presumption that Congress does not intend to supplant state law," particularly in areas of traditional state regulation.  *Id.* at 642–43.  We therefore presume that Congress has not preempted the "historic police powers of the States . . . unless that was the clear and manifest purpose of Congress."  *Cal. Tow Truck Ass'n v. City & County of San Francisco*, 807 F.3d 1008, 1019 (9th Cir. 2015) (quoting *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 438 (2002)).

The FAAAA provides, in relevant part:

> (1) General rule.–Except as provided in
> paragraphs (2) and (3), a State, political
> subdivision of a State, or political authority
> of 2 or more States may not enact or enforce
> a law, regulation, or other provision having
> the force and effect of law related to a price,
> route, or service of any motor carrier . . . ,
> broker, or freight forwarder with respect to
> the transportation of property
>
> (2) Matters not covered.–Paragraph (1)–(A)
> shall not restrict the safety regulatory
> authority of a State with respect to motor
> vehicles . . . .

49 U.S.C. § 14501(c).

The phrase "related to" in the FAAAA "embraces state laws 'having a connection with or reference to' . . . 'rates, routes, or services,' whether directly or indirectly." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quoting *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008)). To determine whether a state law has a "connection with" rates, routes, or services, we "examine the actual or likely effect" of the law.[2] *Am. Trucking Ass'ns,*

---

[2] Preemption resulting from "reference to" prices, routes, or services occurs when "a State's law acts immediately and exclusively upon" prices, routes, or services, or "where the existence of [a price, route or service] is essential to the law's operation." *Air Transp. Ass'n of Am. v. City & County of San Francisco*, 266 F.3d 1064, 1071 (9th Cir. 2001) (alteration in original) (quoting *Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 325 (1997)). We do not

*Inc. v. City of Los Angeles*, 660 F.3d 384, 396 (9th Cir. 2011), *rev'd in part on other grounds*, 569 U.S. 641 (2013). If, for example, the law "mandates that motor carriers [or brokers] provide a particular service to customers, or forbids them to serve certain potential customers, the effect is clear, and the provision is preempted . . . ." *Id.* By contrast, state laws that affect prices, routes, or services "in only a 'tenuous, remote, or peripheral . . . manner' with no significant impact on Congress's deregulatory objectives" are not preempted. *Su*, 903 F.3d at 960 (quoting *Rowe*, 552 U.S. at 371).

In passing the FAAAA, which is modeled on the Airline Deregulation Act of 1978 (the "ADA"),[3] Congress sought to achieve two broad objectives. *Id.* First, it sought to eliminate the competitive advantage air carriers enjoyed relative to motor carriers. Courts had interpreted the ADA as preempting state regulation of air carriers, but not motor carriers. *Id.* Second, it sought to "address the inefficiencies, lack of innovation, and lack of competition caused by non-uniform regulations of motor carriers." *Id.* In particular, Congress was "concerned about States enacting 'barriers to entry, tariffs, price regulations, and laws governing the types of commodities that a carrier could transport.'"[4] *Id.* at 960–

_____

address whether Miller's negligence claim is preempted under this separate prong.

[3] The ADA provides, in relevant part, that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1).

[4] For an in-depth discussion of the FAAAA's legislative history, see *Californians For Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1187–88 (9th Cir. 1998).

61 (quoting *Dilts*, 769 F.3d at 644); *see* H.R. Conf. Rep. 103-677, at 82–88 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1754–60 (confirming that in passing the FAAAA, Congress was focused on economic deregulation of the trucking industry).

No circuit court has yet considered an FAAAA preemption challenge brought by a broker, and district courts have reached differing conclusions as to whether negligence claims like Miller's are "related to" broker services. *Compare Scott v. Milosevic*, 372 F. Supp. 3d 758, 769–70 (N.D. Iowa 2019) (holding that personal injury claims alleging negligence are not "related to" broker services), *with Loyd v. Salazar*, 416 F. Supp. 3d 1290, 1295–98 (W.D. Okla. 2019) (holding that such claims are "related to" broker services), *and Creagan v. Wal-Mart Transp., LLC*, 354 F. Supp. 3d 808, 813 (N.D. Ohio 2018) (same).  District courts are also divided on the question of whether the safety exception applies in this context.  *Compare Lopez v. Amazon Logistics, Inc.*, No. 3:19-CV-2424-N, __ F. Supp. 3d __, 2020 WL 2065624, at *6–8 (N.D. Tex. Apr. 28, 2020) ("[P]ersonal injury tort claims, including a negligent-hiring claim, are within the scope of section 14501(c)(2)'s exception."), *with Creagan*, 354 F. Supp. 3d at 813–14 (holding that the safety exception does not apply to negligence claims asserted against brokers, including those arising out of personal injuries).

## B. Miller's Negligence Claim Is "Related to" Broker Services

Miller contends that his negligence claim against C.H. Robinson is not preempted because it is not "meaningfully distinguish[able]" from three state laws we have held escape preemption under the FAAAA.  We therefore begin our discussion by briefly reviewing those three cases—

*Californians For Safe & Competitive Dump Truck Transportation v. Mendonca*, 152 F.3d 1184 (9th Cir. 1998), *Dilts v. Penske Logistics, LLC*, 769 F.3d 637 (9th Cir. 2014), and *California Trucking Association v. Su*, 903 F.3d 953 (9th Cir. 2018).

In *Mendonca*, we held that the FAAAA does not prohibit California from enforcing its prevailing wage law (the "CPWL") against motor carriers. The CPWL requires contractors and subcontractors awarded public works contracts to pay their workers no less than the prevailing wage in a given locality. *See* Cal. Lab. Code § 1771. We reasoned that although the CPWL "in a certain sense is 'related to' [motor carrier] prices, routes and services . . . the effect is no more than indirect, remote and tenuous," and it does not "*acutely* interfer[e] with the forces of competition." *Mendonca*, 152 F.3d at 1189. Then, in *Dilts*, we held that California's meal and rest break laws are not "related to" motor carrier prices, routes, or services because they "do not set prices, mandate or prohibit certain routes, or tell motor carriers what services they may or may not provide, either directly or indirectly." 769 F.3d at 647. Instead, they are "normal background rules for almost *all* employers doing business in [California]," and the fact "motor carriers may have to take [them] into account . . . when allocating resources and scheduling routes" is insufficient to show that they are preempted. *Id.* Most recently, we held that the FAAAA does not preempt the use of California's common-law test for determining whether a motor carrier has properly classified its drivers as independent contractors because it is not "related to" carrier prices, routes, or services. *See Su*, 903 F.3d at 957.

In arguing that *Mendonca*, *Dilts*, and *Su* "must control here," Miller overlooks an important distinction between his

claim and the laws at issue in those cases—namely, the point at which the law affects a broker (or motor carrier's) business.  As we have previously observed:

> What matters [for purposes of preemption under the FAAAA] is not solely that the law is generally applicable, but where in the chain of a motor carrier's business it is acting to compel a certain result (*e.g.*, consumer or workforce) and what result it is compelling (*e.g.*, a certain wage, non-discrimination, a specific system of delivery, a specific person to perform the delivery).

*Su*, 903 F.3d at 966.  The wage and hour laws at issue in *Mendonca* and *Dilts*, for example, "[i]n effect . . . compelled new terms in motor carriers' agreements with their workers," but we permitted "California to interfere with th[at] relationship."  *Id.* at 963.  Miller's claim, by contrast, seeks to hold C.H. Robinson liable at the point at which it provides a "service" to its customers.

Here, as Miller concedes, the "selection of motor carriers is one of the core services of brokers."[5]  *See* 49 U.S.C. § 13102(2) (defining "broker," as it is used in the FAAAA, to mean "a person, other than a motor carrier . . . , that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation"); *see also* 49 C.F.R. § 371.2 (defining "brokerage service" as "the arranging of

---

[5] Because C.H. Robinson has not argued that Miller's claim is "related to" its prices or routes, we only address whether it is "related to" C.H. Robinson's services.

transportation"). Because Miller's negligence claim seeks to interfere at the point at which C.H. Robinson "arrang[es] for" transportation by motor carrier, it is directly "connect[ed] with" broker services in a manner that was lacking in *Mendonca*, *Dilts*, and *Su*. *See Dilts*, 769 F.3d at 649 (observing that state laws have "an impermissible effect" when they "interfer[e] at the point that a carrier provides services to its customers").

We find *Northwest, Inc. v. Ginsberg*, 572 U.S. 273 (2014) instructive on this point. There, the Supreme Court held that the ADA preempted a breach of the implied covenant of good faith and fair dealing claim that stemmed from an airline terminating the plaintiff from its frequent-flyer program.[6] *Id.* at 284–85. The claim "clearly" had the forbidden "connection with" air carrier "services, *i.e.*, access to flights and to higher service categories," as well as air carrier prices. *Id.* at 284. In reaching this conclusion, the Court rejected the plaintiff's argument that he was contesting his termination from the program—not his "access to flights and upgrades"—because it "ignore[d] [his] reason for seeking reinstatement of his membership, *i.e.*, to obtain reduced rates and enhanced services." *Id.* at 284–85. We have found no reasonable ground for distinguishing *Ginsberg* from this case: Just as a claim that seeks reinstatement of frequent-flyer benefits has a forbidden "connection with" air carrier services, a claim that imposes an obligation on brokers at the point at which they arrange for transportation by motor carrier has a "connection with" broker services.

---

[6] Because the FAAAA is modeled on the ADA, "ADA preemption cases can . . . be consulted to analyze FAAAA preemption." *Su*, 903 F.3d at 960.

Miller resists this conclusion by arguing that his claim cannot be preempted because it does not "bind" C.H. Robinson to "specific prices, routes, or services." We have occasionally suggested that preemption occurs only when a state law operates in this way. In *American Trucking Associations*, for instance, we observed that in a "borderline" case, "the proper inquiry is whether the provision, directly or indirectly, 'binds the carrier . . . to a particular price, route or service . . . .'" 60 F.3d at 397 (quoting *Air Transp. Ass'n of Am. v. City & County of San Francisco*, 266 F.3d 1064, 1072 (9th Cir. 2001)); *see also Dilts*, 769 F.3d at 646 ("[L]aws mandating motor carriers' use (or non-use) of particular prices, routes, or services in order to comply with the law are preempted."). But even these cases acknowledged that the scope of FAAAA preemption is broader than this language suggests. *See, e.g.*, *Dilts*, 769 F.3d at 647 (describing laws that are preempted under the FAAAA as those that "directly or indirectly mandate, prohibit, or *otherwise regulate certain prices, routes, or services*" (emphasis added)).

We note also that few common-law claims, if any, would be preempted if the FAAAA only preempts state laws that bind brokers to specific prices, routes, or services. As an initial matter, there is no question that common-law claims are within the scope of the preemption clause. *See Ginsberg*, 572 U.S. at 284 ("[W]e conclude that the phrase 'other provision having the force and effect of law' includes common-law claims."). Yet common-law claims typically regulate behavior by imposing broad standards of conduct, not by compelling individuals to engage in (or refrain from engaging in) any specific conduct. *See Medtronic*, 518 U.S. at 489 (observing that common-law actions enforce "general duties"). A negligence claim, for example, demands that an individual or entity exercise ordinary care; it does not require

that this standard of care be satisfied in any particular manner.  It therefore does not make sense in this context to ask whether a claim "binds" a broker to a particular price, route or service.  *See Ginsberg*, 572 U.S. at 284–85 (finding the plaintiff's implied covenant claim preempted not because it bound the airline to a particular "price" or "service," but because the plaintiff brought the claim to reinstate his access to the "reduced rates and enhanced services" available through the airline's frequent-flyer program).

Nor are we persuaded by Miller's argument that the reasoning of *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259 (9th Cir. 1998) (en banc), is applicable here.  In *Charas*, we considered whether negligence claims stemming from the provision of certain in-flight amenities, such as luggage handling and beverage services, were preempted under the ADA.  We held that Congress used the term "service" in the ADA in the "public utility sense" to refer to "the provision of air transportation to and from various markets at various times," but not to refer to the various amenities airlines offer their customers.  *Id.* at 1266. Contrary to Miller's suggestion, there is no tension between *Charas*'s construction of the term "service" and our conclusion that when brokers arrange for transportation by motor carrier, they perform a "service" within the meaning of the FAAAA.  Even assuming brokers offer services analogous to airline amenities, motor-carrier selection is plainly not such a service.  It is instead the type of "public utility" service that falls squarely within the scope of the FAAAA.**[7]**  *See Nat'l Fed'n of the Blind v. United States*, 813 F.3d 718, 727 (9th Cir. 2016) (confirming that the term

---

**[7]** The FAAAA, like the ADA, does not define the term "service." *See* 49 U.S.C. § 13102.

"service" in the FAAAA is "focused on 'essential details of the *carriage itself*'" (quoting *Rowe*, 552 U.S. at 373)).

## C. Miller's Negligence Claim Falls Within the Safety Exception

Miller contends that even if his negligence claim is "related to" broker services, it is saved from preemption by the safety exception.  This exception provides that the FAAAA "shall not restrict the safety regulatory authority of a State with respect to motor vehicles."  49 U.S.C. § 14501(c)(2)(A).  In response, C.H. Robinson argues that "the safety regulatory authority of a State" does not encompass common-law claims, and even assuming that it does, Miller's claim is not "with respect to motor vehicles." We consider each of these arguments in turn.

### 1. The "safety regulatory authority of a State" encompasses common-law tort claims.

The FAAAA does not define the phrase "the safety regulatory authority of a State," and we find little else in the FAAAA's text that clarifies its scope.  In general, however, courts have construed the safety exception broadly.  *See Ours Garage*, 536 U.S. at 440 (rejecting "the narrowest possible construction of the [safety] exception"); *Cal. Tow Truck Ass'n*, 807 F.3d at 1022 ("Case law . . . has on the whole given a broad construction to the safety regulation exception." (quoting *VRC LLC v. City of Dallas,* 460 F.3d 607, 612 (5th Cir. 2006)).  With that background in mind, and in light of the purposes of the FAAAA in general and the safety exception in particular, we conclude that "the safety regulatory authority of a State" encompasses common-law tort claims.

As discussed above, in passing the FAAAA, Congress was primarily concerned with the States regulating *economic* aspects of the trucking industry by, for example, enacting tariffs, price regulations, and other similar laws. *See Su*, 903 F.3d at 960. Congress's "clear purpose" in enacting the safety exception, then, was "to ensure that its preemption of States' economic authority over [that industry] . . . 'not restrict'" the States' existing power over "safety." *Ours Garage*, 536 U.S. at 439 (quoting 49 U.S.C. § 14501(c)(2)(A)). That power plainly includes the ability to regulate safety through common-law tort claims. *See Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 86 (2d Cir. 2006) ("Historically, common law liability has formed the bedrock of state regulation, and common law tort claims have been described as 'a critical component of the States' traditional ability to protect the health and safety of their citizens.'" (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 544 (1992) (Blackmun, J., concurring in part and dissenting in part))).

We find nothing in the FAAAA's legislative history that suggests Congress intended to eliminate this important component of the States' power over safety. A House Conference Report, for instance, notes that a key interest group abandoned its opposition to the FAAAA subject to "some conditions that would allow regulatory protection to continue for non-economic factors, such as . . . safety," and that the conferees "attempted to address these conditions" by carving out the various exceptions in § 14501(c)(2). H.R. Conf. Rep. 103-677, at 88. This broad reference to "safety" cuts against the narrow construction C.H. Robinson advances. *See Apollo Grp., Inc. v. Avnet, Inc.*, 58 F.3d 477, 480 (9th Cir. 1995) (observing that "safety rationale[s] underl[ie] the law of tort").

We find additional support for our conclusion that "the safety regulatory authority of a State" encompasses some common-law claims in *American Trucking Associations, Inc. v. City of Los Angeles*, 569 U.S. 641 (2013). There, the Supreme Court considered whether requirements in a contract between the City of Los Angeles and trucking companies providing drayage services at the Port of Los Angeles (the "Port") fell within the market-participant exception to preemption.[8] That exception applies where, for example, a State "act[s] as a private party" by "contracting in a way that the owner of an ordinary commercial enterprise could mimic." *Id.* at 651.

The Supreme Court held that the market-participant doctrine did not apply, and that the requirements at issue were "preempted as 'provision[s] having the force and effect of law.'" *Id.* at 648 (alteration in original) (quoting 49 U.S.C. § 14501(c)(1)). Significantly, although the requirements were contained in contracts between the City and the trucking companies, a local ordinance authorized the City to punish violations through criminal sanctions. *Id.* at 650; *see id.* at 651 ("Contractual commitments resulting not from ordinary bargaining . . . , but instead from the threat of criminal sanctions manifest the government *qua* government, performing its prototypical regulatory role."). In reaching this conclusion, *American Trucking* reasoned generally that the FAAAA's preemption clause "targets the State acting as a State, not as any market actor—or otherwise

---

[8] Two requirements were alleged to fall within that exception in *American Trucking*. One required trucking companies operating at the Port to affix on each of their trucks a placard with a phone number for reporting environmental and safety concerns, and the other required the companies to submit an off-street parking plan for their trucks. *Am. Trucking Ass'ns*, 569 U.S. at 645.

said, the State acting in a regulatory rather than proprietary mode." *Id.* at 650.  Section 14501(c)(1) therefore "draws a rough line between a government's exercise of regulatory authority and its own contract-based participation in a market." *Id.* at 649.

Of course, the Supreme Court made these observations about the States' "regulatory authority" in the context of clarifying the scope of the FAAAA's preemption clause, not the safety exception.  However, we think that what *American Trucking* said about that authority *is* relevant to the scope of the exception.  In particular, if the preemption provision targets "a government's exercise of regulatory authority," *id.*, and that provision encompasses common-law claims, *see Ginsberg*, 572 U.S. at 284, then surely "the safety regulatory authority of a State" also includes at least some common-law claims.

A number of other considerations support our interpretation as well.  First, if C.H. Robinson were correct that the exception is limited to positive enactments of law, tort claims that are "related to" broker prices, routes, or services might be saved from preemption in states, like California, that have codified their common law,[9] but could not possibly be saved from preemption in states that have not done the same.  It seems unlikely that Congress would have made the availability of this exception dependent on

---

[9] "[U]nlike many jurisdictions, California's general tort law is codified in its civil code." *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1132–33 (9th Cir. 2009); *see, e.g.*, Cal. Civ. Code § 1714(a) ("Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . .").

codification, particularly in light of the FAAAA's goal of uniformity. *Su*, 903 F.3d at 960.

Second, while it is possible to construe "the safety regulatory authority of a State" more narrowly, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'"   *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)).  Because a narrower construction of this clause would place a large body of state law beyond the reach of the exception, we find it appropriate to interpret the clause broadly.  *See id.* (describing this approach as "consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety" (quoting *Medtronic*, 518 U.S. at 485)).

We do not find any of C.H. Robinson's counterarguments persuasive.  C.H. Robinson first focuses on the precise language the Supreme Court used in *Ours Garage* to describe the purpose underlying the safety exception—to leave intact "the preexisting and traditional state police power over safety," 536 U.S. at 439—and argues that because the "police power" may only be exercised by the state legislatures, the safety exception excludes common-law claims.  The district court relied on similar reasoning in finding the exception unavailable.  While the "police power" does generally refer to the States' power to legislate,[10] we think this argument reads too much into *Ours Garage*.  At

---

[10] *See, e.g.*, *Bond v. United States*, 572 U.S. 844, 854 (2014) ("The States have broad authority to enact legislation for the public good— what we have often called a 'police power.'"); *Budd v. Madigan*, 418 F.2d 1032, 1035 (9th Cir. 1969) ("[W]hen the subject lies within the police power of the state, even debatable questions as to reasonableness are not for the Courts, but for the legislature . . . .").

issue in that case were municipal regulations governing tow truck operations—an undisputed exercise of the "safety regulatory authority of a State" and of the "police power." The Supreme Court therefore had no reason to consider whether the safety exception is broader than this language suggests.  And, as noted, we have found no indication in the FAAAA's legislative history that Congress intended to limit the safety exception in this way.

Nor are we persuaded by C.H. Robinson's argument that Congress must have intended to limit the exception to legislative and regulatory enactments given how it has defined "regulatory authority" in other statutes.  None of the statutes C.H. Robinson identifies supplies a general definition for the term "regulatory authority"; instead, in each, the term refers to a specific type of agency.[11]  These statutes also undercut C.H. Robinson's own argument that "the safety regulatory authority of a State" refers to the power to enact *legislation* and regulations since each refers only to an administrative body.[12]

---

[11] *See, e.g.*, 42 U.S.C. § 6807a(e) (defining "State regulatory authority" as "any State agency which has ratemaking authority with respect to the sale of electric energy by any electric utility" (cross-referencing 16 U.S.C. § 2602(17))); 15 U.S.C. § 7201(1) ("The term 'appropriate State regulatory authority' means the State agency or other authority responsible for the licensure or other regulation of the practice of accounting in the State . . . .").

[12] C.H. Robinson also contends that the Supreme Court has "consistently distinguished between state law tort claims and state regulation" when analyzing preemption.  C.H. Robinson does not, however, explain how this general observation has any bearing on the interpretive question presented here.  Nor do any of the cases C.H. Robinson cites assist us.  The preemption clause in *Sprietsma v. Mercury Marine*, for instance, bears little resemblance to the safety exception.

Lastly, C.H. Robinson juxtaposes the safety exception against the preemption provision, reasoning that Congress intentionally crafted an exception that encompasses fewer sources of state law than the preemption provision. *Compare* 49 U.S.C. § 14501(c)(1) ("[A] State . . . may not enact or enforce *a law, regulation, or other provision having the force and effect of law* . . . ." (emphasis added)), *with id.* § 14501(c)(2)(A) ("Paragraph (1) . . . shall not restrict *the safety regulatory authority of a State* . . . ." (emphasis added)). As support for this argument, C.H. Robinson relies on *Russello v. United States* for the proposition that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

The Supreme Court rejected a similar argument in *Ours Garage*, and we do so here as well. *Ours Garage* held that municipal regulations governing tow truck operations fell within the safety exception even though the exception refers only to the "safety regulatory authority *of a State*." 536 U.S. at 442 (quoting 49 U.S.C. § 14501(c)(2)(A)). An argument "of some force" was presented that Congress did not intend this result given the inclusion of the term "political subdivisions of a State" in the preemption clause and

*See* 537 U.S. 51, 63 (2002) (holding that 46 U.S.C. § 4306, which prohibits the States from "establish[ing], continu[ing] in effect, or enforc[ing] a law or regulation establishing a . . . safety standard," does not encompass common-law claims because "the article 'a' before 'law or regulation' implies a discreteness" that is absent from the common law, and if "law" were interpreted broadly so as to include common-law claims, it would render the express reference to "regulation" superfluous).

exclusion of that term from the safety exception. *Id.* at 434. But *Ours Garage* ultimately determined that the "requisite 'clear and manifest indication that Congress sought to supplant local authority'" was lacking for a number of reasons. *Id.* (quoting *Wis. Pub. Intervenor v. Mortier,* 501 U.S. 597, 611 (1991)).

First, the safety exception does not actually "borrow" any language from the preemption clause. *See id.* at 435–36 ("The *Russello* presumption that the presence of a phrase in one provision and its absence in another reveals Congress' design . . . grows weaker with each difference in the formulation of the provisions under inspection."). Second, section 14501(c)(2) comprises three separate exceptions, and each is stated differently.[13]          *See id.* 435 n.2

---

[13] Section 14501(c)(2) provides, in full:

(2) Matters not covered.–Paragraph (1)–

(A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization;

(B) does not apply to the intrastate transportation of household goods; and

(C) does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the regulation of tow truck operations performed without

(characterizing these differences as "relevant to the interpretive weight that may be attached to the variation among [the exceptions]").  For these same reasons, the fact the safety exception concisely refers to "the regulatory authority of a State," instead of spelling out the various ways the States can exercise that broad power, does not clearly signal that Congress intended to exclude all common-law claims from the exception's reach.

### 2. Negligence claims against brokers that stem from motor vehicle accidents are "with respect to motor vehicles."

C.H. Robinson also contends that Miller's claim does not fall within the safety exception because it does not satisfy the "with respect to motor vehicles" clause.  Specifically, C.H. Robinson argues that because it neither owned the vehicle nor selected the driver who caused the accident, Miller's claim is not "with respect to motor vehicles."  Miller responds that his claim indirectly "regulate[s] the use of motor vehicles" by "creating incentives for brokers to select safer carriers . . . and thereby reduce the risk of trucking accidents."

We have previously held that the phrase "with respect to" in the safety exception is synonymous with "relating to." *Cal. Tow Truck Ass'n*, 807 F.3d at 1021 (quoting *In re Plant Insulation Co.*, 734 F.3d 900, 910 (9th Cir. 2013)). "Consequently, the FAAAA's safety exception exempts from preemption safety regulations that 'hav[e] a connection

---

the prior consent or authorization of the owner or operator of the motor vehicle.

49 U.S.C. § 14501(c)(2).

with' motor vehicles," whether directly or indirectly.[14]  *Id.* at 1021–22 (quoting *Dan's City Used Cars*, 569 U.S. at 260). For example, we have held that the safety exception applies to municipal regulations governing who may obtain a tow truck permit, including a requirement that permit applicants disclose their criminal history.  *Id.* at 1026–27.  In reaching this conclusion, we rejected the argument that the "valid safety rationales" in this context are limited "to those concerned only with the safe physical operation of the tow trucks themselves."  *Id.* at 1023.  "Rather, regulations that are 'genuinely responsive' to the safety of other vehicles and individuals involved in the towing process may also be exempted from preemption."[15]  *Id.*

If criminal history disclosure requirements for tow truck drivers have the requisite "connection with" motor vehicles,

---

[14] Although not argued by the parties, we note that *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) gave a narrower construction to the phrase "with respect to."  *See id.* at 501 (holding that negligence claims stemming from the alleged defective manufacturing and labeling of a pacemaker were not preempted by 21 U.S.C. § 360k(a) in part because the "common-law requirements" at issue "were not specifically developed 'with respect to' medical devices" (quoting 21 U.S.C. § 360k(a))).  We do not find *Medtronic*'s construction of that phrase applicable here because we are interpreting a savings clause, not a preemption clause.

[15] A number of our sister circuits have given the safety exception a similarly broad construction.  *See, e.g.*, *Cole v. City of Dallas*, 314 F.3d 730, 732–35 (5th Cir. 2002) (holding that an ordinance prohibiting individuals convicted of specified criminal offenses from obtaining a tow truck permit fell within the safety exception because the regulation has, "at its core, [a] concern for safety"); *Ace Auto Body & Towing, Ltd. v. City of N.Y.,* 171 F.3d 765, 768–69 (2d Cir. 1999) (rejecting the argument that the safety exception "extends only to safety regulation of the mechanical components of motor vehicles . . . and not to municipal management of vehicular accidents").

then negligence claims against brokers that arise out of motor vehicle accidents must as well: Neither directly regulates motor vehicles, but both promote safety on the road. *See id.* at 1025 (noting that the safety exception "extends to regulations that protect safety in connection with motor vehicles towed and the individuals who interact with tow truck operators and firms"); *see also Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 774 (2d Cir. 1999) (construing the safety exception as "encompass[ing] the authority to enact safety regulations with respect to motor vehicle accidents and break-downs" because such a construction "fully comports with Congress' purpose to leave intact state and local safety regulatory authority").

We hold that negligence claims against brokers, to the extent that they arise out of motor vehicle accidents, have the requisite "connection with" motor vehicles. Therefore, the safety exception applies to Miller's claim against C.H. Robinson.

**REVERSED and REMANDED.**

---

FERNANDEZ, Circuit Judge, concurring in part and dissenting in part:

I concur in parts I, II and III A, B, C.1 of the majority opinion. However, I respectfully dissent from part C.2. Therefore, I would affirm the district court's decision.

Put succinctly, in my opinion, Miller's claim does not come within 49 U.S.C. § 14501(c)(2)(A) (the "safety exception"). The safety exception provides that § 14501(c)(1) "shall not restrict the safety regulatory authority of a State with respect to motor vehicles."

49 U.S.C. § 14501(c)(2)(A).  While I agree that the safety exception includes state common law tort claims in principle, in my opinion, it does not apply to Miller's negligence claim against C.H. Robinson because that claim does not amount to one under "the safety regulatory authority of a State with respect to motor vehicles." *Id.*  C.H. Robinson is a broker, which is "a principal or agent [that] sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." *Id.* § 13102(2).  A motor carrier, in turn, is "a person providing motor vehicle transportation for compensation." *Id.* at (14).  And, a broker cannot be a motor carrier. *Id.* at (2).  Those definitions make clear that as a broker, C.H. Robinson and the services it provides have no direct connection to motor vehicles or their drivers.  Any connection is merely indirect—for example, via an intermediary motor carrier.

That attenuated connection is simply too remote for the safety exception to encompass Miller's negligence claim.  In holding otherwise, the majority opinion relies on cases that applied the safety exception to regulations of the tow truck business, such as those regarding the criminal histories of would-be tow truck drivers[1] and prohibiting certain

---

[1] *See Cal. Tow Truck Ass'n v. City & County of San Francisco*, 807 F.3d 1008, 1026–27 (9th Cir. 2015) (requiring tow truck driver permit applicants to list all arrests for criminal offenses); *Cole v. City of Dallas*, 314 F.3d 730, 732, 734–35 (5th Cir. 2002) (per curiam) (prohibiting those convicted of certain crimes from receiving tow truck driver permits); *Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 776 (2d Cir. 1999) (tow truck driver criminal history requirements).

dangerous conduct by drivers while operating tow trucks.[2] But in those cases, there was a very close connection to the actual operational safety of motor vehicles. Indeed, the regulatory requirements regarding towing were "'genuinely responsive' to [a] set of real safety concerns" related to motor vehicles that had motivated the regulations in the first place. *Cal. Tow Truck*, 807 F.3d at 1026; *see id.* at 1023. By contrast, Miller's claim is not "with respect to motor vehicles," within the meaning of the exception. *See* § 14501(c)(2)(A). Rather, it is with respect to C.H. Robinson's broker services,[3] which are only tangentially "relat[ed] to"[4] or "connect[ed] with"[5] motor vehicles. In other words, while one can envision an almost unending series of connections, there comes a point at which the series must end as a legal matter. *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260–61, 133 S. Ct. 1769, 1778, 185 L. Ed. 2d 909 (2013); *cf. Elias v. Arthur Andersen & Co. (In re Fin. Corp. of Am. Shareholder Litig.)*, 796 F.2d 1126, 1130–31 (9th Cir. 1986); *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 103 (N.Y. 1928) (Andrews, J., dissenting). Miller's claim is beyond that point. Allowing it to avoid preemption would inevitably conscript brokers into a parallel regulatory regime that required them to evaluate and screen motor carriers (which are already subject to federal

---

[2] *Ace Auto Body*, 171 F.3d at 769, 774–75 (regulations to curtail tow truck drivers' practice of competitively racing to accident scenes).

[3] *See* Opinion at 13.

[4] *Cal. Tow Truck*, 807 F.3d at 1021 (internal quotation marks omitted).

[5] *Id.* (internal quotation marks omitted).

registration requirements[6] as well as state and local regulations) according to the varied common law mandates of myriad states.  It could even require brokers to effectively eliminate some motor carriers from the transportation market altogether.   That is a far cry from municipal ordinances that require tow truck driver applicants to disclose their criminal histories, or that impose a rotational system to discourage competing tow truck drivers from racing each other to accident scenes.  *See Cal. Tow Truck*, 807 F.3d at 1020–23, 1026–27; *Cole*, 314 F.3d at 732, 734–35; *Ace Auto Body*, 171 F.3d at 774–76.  The words of the safety exception cannot be stretched that far.

Despite the broad language that we have used in applying the safety exception to some municipal towing regulations,[7] I would not unmoor that reasoning from the factual circumstances presented there, nor would I transpose it to the distinctly different area of broker services.  Rather, we should hold that Miller's negligence claim is expressly preempted and the safety exception is inapplicable.

Thus, while I concur in much of what the majority decides, ultimately I respectfully dissent.

---

[6] *See* 49 U.S.C. § 13902(a)(1).

[7] *Cal. Tow Truck*, 807 F.3d at 1023.